IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| JEREMY DON CUMMINGS, | ) | CIVIL ACTION NO. 9:15-00030-CWH-BM |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein he was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits ("DIB") on July 11, 2011, and

Supplemental Security Income ("SSI")[1] on July 18, 2011 (protective filing dates), alleging disability

beginning May 1, 2007, due to a low back injury requiring surgery, right hip pain, right leg

pain/numbness, reading/writing ability at approximately the fourth grade level, and limited

comprehension skills. (R.pp. 9, 205, 214, 228). Plaintiff's claims were denied both initially and upon

---

[1]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot establish that she was disabled during the insured period for DIB may still receive SSI benefits if she can establish that she is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005); see also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].



reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 8, 2013. (R.pp. 21-54). The ALJ thereafter denied Plaintiff's claims in a decision issued October 1, 2013. (R.pp. 9-20). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-3).

Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

## Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].



<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F.2d 640 (4th Cir. 1966)); <u>see</u> <u>also</u> <u>Hepp v.</u>

<u>Astrue</u>, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less

demanding than the preponderance of the evidence standard"].

      The Court lacks the authority to substitute its own judgment for that of the

Commissioner.  <u>Laws</u>, 368 F.2d at 642.  "[T]he language of [405(g)] precludes a de novo judicial

proceeding and requires that the court uphold the [Commissioner's] decision even should the court

disagree with such decision as long as it is supported by substantial evidence."  <u>Blalock v.</u>

<u>Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).

### <u>Discussion</u>

      A review of the record shows that Plaintiff, who was thirty-two years old when he

alleges he became disabled, has a limited education and  past relevant work experience as a roofer,

labor construction/roofer helper, car body fabricator, and boat repairer.  (R.pp. 18, 205, 214, 247).

In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must

show that he has an impairment or combination of impairments which prevent him from engaging

in all substantial gainful activity for which he is qualified by his age, education, experience, and

functional capacity, and which has lasted or could reasonably be expected to last for a continuous

period of not less than twelve (12)  months.  After a review of the evidence and testimony in the case,

the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of

degenerative disc disease of the lumbar spine with mild facet arthritis; status post laminectomy in

2003 for an annular tear with impingement; some persistent right lower extremity symptoms;

---

    [2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to
do basic work activities. <u>See</u> 20 C.F.R. § 404.1521(a); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140–142
(1987).



borderline intellectual functioning; and a learning disorder (R.p. 11), he nevertheless retained the residual functional capacity ("RFC") for a reduced range of light work,[3] with restrictions of no climbing of ladders, ropes, or scaffolds; no crawling; no more than occasional stooping, crouching, kneeling, balancing, or climbing of stairs or ramps; no more than occasional use of right lower extremity controls; only unskilled work; no complex reading at higher than a fourth grade level; no more than occasional contact with the public; and no more than occasional team-type interaction with co-workers. (R.p. 14). At step four, the ALJ found that these limitations rendered Plaintiff unable to perform any of his past relevant work. However, she then obtained testimony from a vocational expert ("VE") and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations, and was therefore not disabled during the period at issue. (R.pp. 18-19).

Plaintiff asserts that in reaching this decision, the ALJ erred because she failed to consider Plaintiff's combination of impairments, performed a flawed Listing[4] analysis (in finding that Plaintiff failed to meet Listings 12.02 and 12.05), and performed a flawed RFC analysis. After careful review of the record and consideration of the arguments presented, the undersigned is constrained to agree with the Plaintiff that this case should be reversed and remanded because the ALJ erred in conducting her Listing analysis.

---

[3]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[4]In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.



## **Medical and School Records**

In 1989, when Plaintiff was in eighth grade, Mary Louise Payton, a School Psychologist with the Special Needs Services at Falmouth (Massachusetts) Public Schools, noted that Plaintiff had a full scale IQ score of 78, which appears to be from the WAIS-R (R.p. 308). She evaluated Plaintiff as functioning at a low average classification and requiring a "substantially separate program to deal with his needs." (R.p. 310). Plaintiff reportedly collected SSI payments for a number of years (at least from age eighteen to twenty-two and perhaps longer), and then went to work at age twenty-four. (R.p. 34).

Plaintiff was reportedly treated by Drs. Nichols and Hassler in Hartsville, South Carolina as well as by Pee Dee Orthopedics related to injuries he suffered to his lower back while working as a roofer. On July 2, 2003, he underwent back surgery at L4-5, although there are no surgical records on file. (See R.p. 394).

On April 11, 2007, Plaintiff was treated by Dr. Charles Davis at the Carolina Pines Regional Medical Center for low back and right leg pain. An MRI revealed evidence of a prior right laminectomy at L4-5; a mild decreased signal in the L4-5 and L5-S1 interspace at T2, representing disc dessication; and an abnormal signal of the annulus posteriorly at the L4-L5 level, suggesting an annular tear. There was no evidence to suggest focal herniation,, nucleus pulposus, spinal stenosis, or lateral recess compromise. (R.p. 349).

In November 2007, Plaintiff underwent psychological testing with Dr. J. Theodore Brown, Jr., a psychologist, at the request of the Agency. Testing revealed a full range IQ score of 65, which was considered to be within the deficient range, and it was noted that although Plaintiff could dress, bathe, and groom himself, he did not have a driver's license and could not physically exert



5

himself because of chronic back pain.  Dr. Brown's impression was that Plaintiff was impaired by an otherwise unspecified learning disorder, mild mental retardation, and chronic back pain.  Prognosis for improvement was thought to be dependent on Plaintiff being able to find some relief for his physical pain sufficient to allow him to perform useful activity independent of his limited intellectual ability.  Dr. Brown further opined that Plaintiff should not, given his limited intellectual ability, be allowed to manage his own funds.  (R.pp. 359-362).

On June 19, 2009, an MRI of Plaintiff's lumbar spine revealed degenerative disc disease at L4-5 and 5-S1, mild osteoarthritis, and likely muscle spasm.  (R.p. 368).   In June, August, and October 2009, Plaintiff was treated and prescribed pain medications (including narcotic pain medication) by Dr. Emmanuel Quaye of The Medical Group in Hartsville, South Carolina for Plaintiff's chronic lower back pain.  (R.pp. 364-367).  Plaintiff was also treated at Caresouth Carolina on July 23, 2010, for complaints of dizziness and increased pain in his right leg due to nerve damage in his back. (R.p. 383).

Dr. Harriett R. Steinert conducted a consultative orthopedic examination on November 7, 2011.  A lumbar spine x-ray revealed defuse endplate and facet joint arthritis. (R.p. 400).  Plaintiff told Dr. Steinert he had had a back injury with prior surgery in 2003 resulting in alternating pain and numbness in his lumbar spine radiating to his hip and leg, that he had limited reading and writing skills, and a ninth grade education in special education.  On examination Plaintiff complainted of considerable pain in his lumbar region as well as an inability to walk on his toes and heels, tandem walk, or crouch down.  Dr. Steinert diagnosed degenerative disc disease of the lumbar spine and illiteracy.  (R.pp. 388-391).



Another psychological evaluation was conducted by Dr. Katherine Kelly, a psychologist, on November 12, 2011. Plaintiff reported that he had never been married, had few friends, kept to himself when he went out, and had difficulty getting along with co-workers and supervisors. He said he did not "do much of nothing", and advised that his typical day consisted of watching television. Plaintiff said that he could fix hot dogs, spaghetti, and use the microwave, but he could not fix dinners and did not know how to use the washing machine. He also could not do yard work, play sports, or be active in his son's life because of his disabilities. Plaintiff stated that he lost his last job as a result of his back injury, and was dismissed in 2003 from a job at Gardner Roofing after making a disability claim related to a job-related accident. He reported that he could not read or write beyond what he thought was a second grade level in comparison to his son's (who was in the sixth grade) ability to read, and that he used his son as his designated reader.

Plaintiff reported he was depressed because he could not work and provide for his son; that he had difficulty talking to some people; and suffered from pain in his back, right hip, and leg. Dr. Kelly noted that Plaintiff presented with intellectual functioning in the extremely low to borderline range, that his judgment and insight were fair to poor, and that he had an inability to take care of his own finances. Testing revealed a full scale IQ score of 63, indicating extremely low intellectual functioning. Achievement testing revealed that Plaintiff read and spelled at a first grade level, and did arithmetic at a second grade level. Dr. Kelly thought that although Plaintiff's scores might be somewhat low, they were not excessively so; that the testing approximated Plaintiff's current overall functioning; there was no evidence of malingering; and that Plaintiff showed no overt behaviors that would suggest he was not giving appropriate effort. Dr. Kelly diagnosed Plaintiff as



suffering from a learning disorder, low intellectual functioning, and L4-5 back pain with radiating pain into his right hip and leg. (R.pp. 393-397).

In December 2011, Dr. Jim Liao, a state agency physician, reviewed Plaintiff's medical records and opined that Plaintiff had the physical RFC to perform medium work. (R.pp. 64-65). Also in December 2011, Dr. Judith Von, a state agency psychologist, opined after a review of Plaintiff's records that although Plaintiff's recent IQ score of 63 suggested intellectual disability, his adaptive functioning and prior school placement records were inconsistent with an intellectual disability. She further opined that Plaintiff's intellectual disability did not meet or equal Listings 12.02 or 12.05, and that Plaintiff had only a mild restriction in activities of daily living; moderate restrictions in social functioning; moderate restrictions in concentration, persistence, and pace; and no episodes of decompensation. She thought that Plaintiff could meet the mental demands of unskilled work; could understand simple instructions and perform simple tasks without supervision but would have difficulty understanding, remembering, and concentrating on detailed complex instructions; and that he could attend work regularly and concentrate for the required periods. She also did not think that Plaintiff's ability to perform the necessary activities of daily living was severely impaired. Dr. Von opined that Plaintiff would function best in a work setting that did not require interaction with the general public or a large number of coworkers, and that he had the ability to adapt to normal changes in the workplace, travel to and from work, and avoid dangers in the workplace. (R.pp. 62-63, 65-67).

Dr. Darla Mullaney, another state agency physician, opined in May 2012 that Plaintiff had the physical RFC to perform a limited range of light work involving no crawling or climbing of ladders, ropes, or scaffolds, and only occasional climbing of ramps and stairs, balancing, stooping,



kneeling, and crouching.  (R.pp. 89-91, 104-106).  In May 2012, Dr. Manhal Weiland, a state agency

psychologist, reviewed Plaintiff's records and concurred with Dr. Von's assessment of Plaintiff

impairment and abilities (discussed above). (R.pp. 91-93, 106-108).

### Allegations of Error

Plaintiff asserts that the ALJ erred in failing to find that his mental impairments met

Listings 12.02(C) and 12.05(C).  While the Commissioner correctly notes that Plaintiff's previous

counsel (he is represented by new counsel in the present action) failed to assert in his pre-hearing

brief that he met or equaled a Listing, she also further argues that in any event Plaintiff has failed to

show that he meets or medically equals all the criteria of these Listings.  See Sullivan, 493 U.S. at

530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all*

of the specified criteria.  An impairment that manifests only some of those criteria, no matter how

severely, does not qualify."].  Plaintiff's assertion with respect to each of these two Listings is

discussed hereinbelow.

### Listing 12.02(C)

Listing 12.02(C) provides as follows:

Organic Mental Disorders: Psychological or behavioral abnormalities associated with
a dysfunction of the brain. History and physical examination or laboratory tests
demonstrate the presence of a specific organic factor judged to be etiologically related
to the abnormal mental state and loss of previously acquired functional abilities.
The required level of severity for these disorders is met when the requirements ... in
C are satisfied.

* * *

C. Medically documented history of a chronic organic mental disorder of at
least 2 years' duration that has caused more than a minimal limitation of
ability to do basic work activities, with symptoms or signs currently attenuated
by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration;
or



> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

In determining whether a claimant meets or medically equals a listed impairment, an ALJ should "identif[y] the relevant listed impairments[,]" and then "compare[] each of the listed criteria to the evidence of [the claimant's] symptoms." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). In her decision, the ALJ specifically found that Plaintiff failed to satisfy any of the applicable "paragraph C" criteria for Listing 12.02. (R.pp. 13-14). After careful review of the record and arguments presented, the undersigned can find no reversible error in the ALJ's conclusions.

In asserting this claim, Plaintiff has not presented any medical evidence of repeated episodes of decompensation or predictive episodes of decompensation (as required under 12.02(C)(1) or (2)), nor did any of the examining or reviewing (state agency) psychologists note any such episodes. Rather, Plaintiff argues that he has a current history of one or more year's inability to function outside of a highly supportive living arrangement because his parents pay for him to live and he lives with a friend. Plaintiff's Brief, pp. 16-17. However, Plaintiff has not shown that this qualifies as a "highly supportive living arrangement." As explained in Appendix A,

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a

10



structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F).

In Plaintiff's case, although he lived first with his sister and then with a friend and the friend's children during the relevant time period, he reported that he can take care of his basic hygiene needs, fix simple meals, and (with transportation from others) shop for groceries.  (R.pp. 258-259, 361, 393).  As such, there is simply no evidence indicating that either of these living arrangements constituted a highly structured and supportive setting to take care of Plaintiff's mental demands. Therefore, Plaintiff's argument that the ALJ erred by failing to find that his impairments met the requirements of Listing 12.02(C) is without merit.

### Listing 12.05(C)

Listing 12.05(C) provides as follows:

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * * * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

Plaintiff argues that he meets Listing 12.05(C) because he has valid IQ scores in the required range of 60 through 70 and another impairment imposing additional and significant work-related limitations of function (back impairment).



The ALJ found that Plaintiff did not meet Listing 12.05(C) because Plaintiff did "not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (R.p. 14). However, Plaintiff has presented evidence of a physical impairment (back impairment) imposing an additional and significant work-related limitation of function (which the Commissioner concedes in her Brief - see ECF No. 14 at 15 n. 2), as he has degenerative disc disease of his lumbar spine which the ALJ found was a severe impairment and which limited Plaintiff's RFC to a range of light work based on his physical impairments. (See R.p. 11, 14, 18). Additionally, the ALJ also found that Plaintiff's impairments prevented him from performing his past relevant work. (R.p. 18). See Rainey v. Heckler, 770 F.2d 408, 410-411 (4th Cir. 1985) [If a claimant cannot perform his past relevant work, that fact alone establishes the "other, significant work-related limitation of function" required under § 12.05C.].

Therefore, the ALJ's decision appears to rest on a finding that Plaintiff did not have a valid IQ of between 60 and 70. In doing so, the ALJ concluded that "the most persuasive intelligence testing indicates that the claimant enjoys at least borderline intellectual functioning." (R.p. 14). Although the ALJ did not fully explain at step three why she discounted Plaintiff's most recent IQ scores (63 in 2011 and 65 in 2007), which were within the required range for this Listing, in the RFC portion of her decision she states that she had rejected the IQ scores of 63 (from testing with Dr. Kelly) and 65 (from testing with Dr. Brown) because Dr. Kelly noted less than optimal performance, Plaintiff's remote education records refuted his more recent lower IQ scores, Plaintiff's school records indicated a full-scale IQ score of at least 78, there was nothing in the record to support



the recent lower IQ scores, and Plaintiff had worked multiple skilled jobs in the past, which was inconsistent with the more recent intelligence testing. (R.p. 17).

An ALJ may discredit IQ scores based on "other evidence contradicting them", and "has the discretion to assess the validity of an IQ test and is not required to accept it even if it is the only such result in the record". <u>Hancock v. Astrue</u>, 667 F.3d 470, 474-475 (4th Cir. 2012). However, in discounting Plaintiff's more recent IQ scores, the ALJ appears to have mischaracterized or failed to consider all of Dr. Kelly's findings. Although Dr. Kelly did write that Plaintiff's behavior indicated that his performance "was somewhat less than optimal," she also stated that there was nothing to suggest malingering, noted that Plaintiff showed "no overt behaviors that would suggest he was not giving appropriate effort", and concluded that although Plaintiff's scores might be low, they were not excessively so and "would approximate his current overall functioning." (R.pp. 395, 397). Additionally, Dr. Kelly diagnosed Plaintiff with low intellectual functioning (described as "extremely low" in her summary). (R.pp. 396-397). As for Dr. Brown, the ALJ did not explain why he found Plaintiff's IQ score of 65 reported by Dr. Brown (which was close to the score reported by Dr. Kelly) to be invalid, even though Dr. Brown had specifically concluded that the "[v]alidity and reliability results of the examination are considered to be [a] valid and reliable estimate of the claimant's current level of functioning." (R.pp. 15, 17, 360).

As for the state agency psychologists, while they wrote that Plaintiff's prior school placement records were not consistent with mental retardation, it is unclear why those records, which indicate that Plaintiff was placed in special education classes, was reading well below his age and grade level, and was receiving low grades (<u>see</u> R.pp. 308-331), were inconsistent with Plaintiff's later IQ scores and psychologist evaluations. The state agency psychologists also acknowledged that the



63 IQ score (from Dr. Kelly's testing) suggested mental retardation (and they did not note any invalidity as to those scores), and did not discuss Dr. Brown's test results indicating an IQ of 65 (or note any invalidity as to his testing).

The ALJ also discounted Plaintiff's 2007 and 2011 IQ scores based on the full scale IQ score of 78 Plaintiff had on the WAIS-R when he was in the eighth grade (when he was approximately sixteen years old). The ALJ thought that this full-scale IQ score was consistent with Plaintiff's academic achievement testing. (R.p. 15). However, although achievement testing in the eighth grade indicated that Plaintiff had a reading level of 3.7 (R.p. 341), testing by Dr. Brown in 2007 and Dr. Kelly in 2011 indicated that Plaintiff was only reading on a first grade level. (R.p. 360, 396). The ALJ also noted that Plaintiff was placed in special education classes, but then appears to discount this as indicative of deficits in intellectual functioning because "education records show [Plaintiff] quit school in the 9th grade." (R.p. 15). However, school records indicate that Plaintiff received grades of F in all classes (except for a D in his physical education class and an incomplete grade in an art class) in ninth grade during the 1990-1991 school year, and had numerous grades of F and D while in the seventh and eighth grades. (R.p. 335). Plaintiff testified that he dropped out of school after he became "so frustrated" after failing ninth grade for the second or third time, and that he never completed a GED; (R.pp. 27, 33); and it is unclear how this record is inconsistent with Plaintiff dropping out of school for reasons related to intellectual disability.

Additionally, to the extent the ALJ may have discounted Plaintiff's IQ scores based on a finding that Plaintiff had the RFC to read at the fourth grade level as a result of Plaintiff's testimony in response to the ALJ's questioning at the hearing, it is far from clear in this testimony that



Plaintiff said that he could read at a fourth grade level,[5] and even so, such a finding would be based on Plaintiff's own estimation of his reading abilities as compared to those of his son (which are unknown). Further, it is also contradicted by the evidence of a lower reading level, as discussed above.

The ALJ also discounted Plaintiff's lower IQ scores based on his past relevant work, which included some skilled jobs. However, it is unclear from the record whether Plaintiff performed these jobs at the skilled level. As noted by the Commissioner in his brief, the <u>Dictionary of Occupational Titles</u> (DOT),[6] indicates that the job of roofer identified by the VE required a passive vocabulary of 5,000-6,000 words as well as the ability to read at a rate of 190-215 words per minute, read adventure stories and comic books, look up unfamiliar words in dictionary, read instructions for assembling model cars and airplanes; and to write compound and complex sentences. <u>See</u> DOT No.

---

[5]The following is the questioning by the ALJ and Plaintiff's answers:

Q. [ALJ] So, I had seen [sic] something about reading about on a fourth grade level, were you comparing it to your son, is that about what you would estimate your reading to be?

A. [Plaintiff] Pretty close, my son can read better than I can.

Q. Okay. At this time, but when he was back in the fourth grade?

A. Yeah.

Q. So, about fourth grade, okay. Do you have any health insurance?

A. No.

[6]The DOT is "a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy." <u>Burns v. Barnhart</u>, 312 F.3d 113, 119 (3d Cir. 2002). "[T]he DOT, in its job definition, represents approximate maximum requirements for each position rather than the range." <u>See</u> <u>Fenton v. Apfel</u>, 149 F.3d 907, 911 (8th Cir. 1998).

15



866.381-010.  However, Plaintiff's job as a roofer was described in his work history report (which Plaintiff himself apparently had to get someone to fill out for him) as only requiring him to "lift, carry, and roll heavy objects all day" (R.p. 251), while Plaintiff testified that this job required him to carry and lay down heavy materials (R.p. 31).

Similarly, the job the VE identified as a boat repairer involves repairing boats according to blueprints and customer specifications, conferring with supervisors and customers and reading blueprints to determine repairs needed, and requires the ability to read a variety of novels, magazines, and encyclopedias; read safety rules; write reports and essays in proper format, punctuation, spelling, and grammar; use algebra (calculating variables, formulas, and square roots) and geometry (calculating plane and solid figures, circumference, area, and volume); and compute discounts, commissions, and percentages.  See DOT No. 807.361-014.  There is no indication in the record of this case that Plaintiff could perform this type of work.  Plaintiff's work history report described this job as only requiring Plaintiff to sand, paint, and fix imperfections on boats.  (R.p. 253).

That Plaintiff performed these jobs at a skilled level is also contradicted by Plaintiff's testimony that he could not read a newspaper (R.p. 28), his testimony that he has never had a driver's license and that he never took the driver's test because he thought he never would be able to pass it, (R.pp. 40-41), his report to Dr. Kelly that he only read on a first to second grade level (R.p. 294), and scores on tests administered by Dr. Kelly and Dr. Brown indicating that he read on a first grade level (R.pp. 360, 396).  Plaintiff also testified that his inability to read and write affected him a lot when he went to work and that he took instructions and tried to remember them, but there were a lot of

16



times when he was dismissed from jobs because he was not able to follow the instructions given to him. (R.pp. 34-35).

In sum, it does not appear from a plain reading of the decision that the ALJ adequately considered and discussed all of the evidence relating to Plaintiff's IQ. Even so, the Commissioner also argues that even if Plaintiff could show the required valid IQ score, that he has still not shown the required deficits in adaptive functioning for this Listing. Sullivan, 493 U.S. at 530 ["For a claimant to show that his impairment matches a Listing, he must show that it meets *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."]. The Commissioner is correct that, to meet or equal Listing 12.05(C), a claimant is also required to   to   meet the introductory paragraph threshold by showing "significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period"; 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 12.00(A); and that Plaintiff has the burden of proving an adaptive deficiency during the developmental years. Hancock v. Astrue, 667 F.3d at 476 ; see also Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)[claimant has the burden of production and proof at Steps 1 to 4 of the sequential evaluation process]. Deficits in adaptive functioning "include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012)(citing Atkins v. Virginia, 536 U.S. 304, 308 n. 3 (2002)).

The Commissioner contends that Plaintiff cannot show the required deficits because he previously performed skilled work and engaged in significant activities of daily living, including getting his son ready for school, making sure he took his medication, and feeding him; that Plaintiff



could independently care for his personal needs; that Plaintiff prepared simple meals such as hot dogs, sandwiches, frozen dinners, and pasta; washed dishes; loaded the dishwasher; performed light house work occasionally; shopped in stores for clothing and food; watched television such as the news and movies; worked on a computer; and visited with family and neighbors. However, there is conflicting information as to whether Plaintiff had such deficits, with Plaintiff arguing that the Commissioner overstates his abilities as evidenced by his having to live with a roommate, his inability to help his son with his schoolwork because his son long surpassed his reading and writing capabilities (R.p. 399), his inability to use a washing machine (R.p. 399), his testimony that he was unable to get a job in a convenience store because he was unable to operate a cash register (R.p. 30), and his lack of concentration resulting in an inability to complete household chores (R.p. 42, 258). He also argues that his ability to watch television fails to demonstrate intellectual capacity, that he is unable to prepare full meals (R.p. 399), and that his inability to handle his own finances is evidenced by the handling of his finances by his parents (R.pp. 41-42) and the opinion of the psychologists that he could not manage his own finances (R.pp. 362, 395). Plaintiff also testified that he had received SSI benefits from the time he was 18 until the time he was 22 (and maybe until age 24), when he states he began working because he and his child could not live off the "$400 and something a month" that he received. (R.p. 34).[7]

Critically, the ALJ failed to address this part of the Listing in her step three analysis (see R.p. 14). Hence, although the Commissioner argues that even if Plaintiff could show a valid IQ

---

[7]It is unclear from the ALJ's decision whether she considered Plaintiff's prior receipt of SSI before the age of 22. Although it is unclear why Plaintiff received SSI, if he did receive SSI during this time period based on a deficit in intellectual functioning, it may support a finding of deficits in adaptive functioning prior to age 22.



score, he has not shown the required deficits in adaptive functioning, since the ALJ did not herself specifically make such a finding in her decision, this Court cannot do so in the first instance. <u>Pinto v. Massanari</u>, 249 F.3d 840, 847 (9th Cir. 2001)[Court cannot affirm a decision on a ground that the ALJ did not himself invoke in making the decision]. Additionally, as previously noted, the undersigned finds after a consideration of the record that the ALJ failed to adequately address all of the probative evidence, including Dr. Brown's IQ findings, Dr. Kelly's findings that IQ testing did not show any signs of malingering, and Plaintiff's assertion that he received SSI payments from at least age 18 to 22, in determining that Plaintiff did not meet or equal Listing 12.05(C). <u>See</u> <u>Cotter v. Harris</u>, 642 F.2d 700 (3rd Cir. 1981) [Listing cases remanded because of ALJ's failure to provide adequate explanation or reason for accepting or rejecting relevant probative evidence].

While it is certainly possible that the ALJ on remand may still find that Plaintiff does not meet or equal Listing 12.05, that is a finding that must be made by the ALJ after proper consideration of *all* of the evidence. This Court cannot on appellate review make <u>de</u> <u>novo</u> findings of fact on issues not addressed by the ALJ. <u>Nester v. Astrue</u>, No. 08-2045, 2009 WL 349701 at * 2 (E.D. Feb. 12, 2009)[Noting that the Court "may not consider *post hoc* rationalizations but must evaluate only the reasons and conclusions offered by the ALJ."]; <u>see</u> <u>also</u> <u>Bray v. Commissioner of Social Security Admin.</u>, 554 F.3d 1219, 1225 (9th Cir. 2009)["Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."]. Therefore, the case should be reversed and remanded for a proper consideration of all of the evidence relating to Plaintiff's IQ, and with respect to whether Plaintiff meets the required deficits in adaptive functioning under Listing 12.05(C).



With respect to the remainder of Plaintiff's claims of error, the ALJ will be able to reconsider and re-evaluate the evidence in toto as part of the reconsideration of this claim. Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted *de novo*].

### Conclusion

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for revaluation and consideration of whether Plaintiff met or equaled Listing 12.05(C), and for such further administrative action as may be necessary and appropriate. See Shalala v. Schaefer, 509 U.S. 292 (1993).

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

March 8, 2016
Charleston, South Carolina



### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

